**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION**

---

|  |  |  |
|---|---|---|
| JOSIAH CURRY and HOLLY CURRY, individually and as next friends of their minor children, V.C., R.C., Ad.C., C.C., H.C., and An.C., | ) ) ) ) | |
| | ) | |
| *Plaintiffs*, | ) | **Civil No.**  3:17-cv-730-GNS |
| *v.* | ) | |
| | ) | **COMPLAINT** |
| KENTUCKY CABINET FOR HEALTH AND FAMILY SERVICES; | ) ) | **JURY TRIAL DEMANDED** |
| | ) | |
| VICKIE YATES BROWN GLISSON, in her official capacity as Secretary of the Kentucky Cabinet for Health and Family Services; | ) ) ) ) | |
| | ) | |
| KENTUCKY DEPARTMENT FOR COMMUNITY BASED SERVICES, DIVISION OF PROTECTION AND PERMANENCY, | ) ) ) | |
| | ) | |
| JEANETTA CHILDRESS, in her individual capacity; | ) ) | |
| | ) | |
| MICHAEL FURNISH, in his individual capacity; and | ) ) | |
| | ) | |
| SHERIFF JOHN WARD, in his official capacity, | ) ) | |
| *Defendants*. | ) | |

---

## I.     PRELIMINARY STATEMENT

Plaintiffs JOSIAH CURRY and HOLLY CURRY, individually and as next friends of

their six minor children, V.C., R.C., Ad.C., C.C., H.C., and An.C. (collectively "the Curry's"),

seek compensatory damages under 42 U.S.C. § 1983 against Defendants JEANNETTA

CHILDRESS and MICHAEL FURNISH, in their individual capacities. The Plaintiffs bring

Fourth Amendment claims against both defendants for their unlawful, warrantless, and coerced

entry into the Curry's home and the unlawful and warrantless strip search of all six Curry children in the presence of persons of the opposite gender, and a Fourth Amendment claim against Defendant Childress for her unlawful seizure of V.C. The Plaintiffs also bring a Fourteenth Amendment claim against both Defendants Childress and Furnish in that their entry into the Curry's home, detention of V.C., and unlawful strip searches deprived the Curry's of their fundamental liberty interest in parenting their children, the maintenance of their parent-child relationship, and their right to family integrity. The plaintiffs also seek compensatory damages from SHERIFF JOHN WARD, in his official capacity as the policymaker for the Hardin County Sheriff's Office, for adopting a policy or custom of assisting social service investigators with gaining access to private homes as a matter of course, even if the situation is non-emergent or there is no threat to the investigator's safety.

The Plaintiffs also seek declaratory relief pursuant to 28 U.S.C. §§ 2201, *et. seq.* against Defendants KENTUCKY CABINET FOR HEALTH AND FAMILY SERVICES ("Cabinet") and VICKIE YATES BROWN GLISSON in her official capacity as Secretary of the Kentucky Cabinet for Health and Family Services ("Secretary"). The Secretary and the Cabinet have promulgated regulations that encourage social service investigators in non-emergency situations to call law enforcement for assistance with gaining entry into a private home rather than obtaining a court order, in violation of the Fourth and Fourteenth Amendments.

The Plaintiffs also seek injunctive relief against Defendants KENTUCKY CABINET FOR HEALTH AND FAMILY SERVICES, VICKIE YATES BROWN GLISSON, and the KENTUCKY DEPARTMENT FOR COMMUNITY BASED SERVICES, DIVISION OF PROTECTION AND PERMANENCY ("DPP") to compel the expungement of a local file which is kept and maintained by the DPP and contains names, dates of birth, social security numbers,

medical records, and other sensitive, identifying information regarding the Curry's and their children. This file was compiled using information gathered by Investigator Childress during her illegal entry into the Curry's home.

Finally, the plaintiffs seek costs and attorneys' fees pursuant to 42 U.S.C. § 1988, any other and further relief that the Court deems proper, and a trial by jury when the issues are joined. In support of the causes of action presented herein, Plaintiffs state as follows:

## II.      JURISDICTION AND VENUE

1.      This action is brought pursuant to 42 U.S.C. §§ 1983 and 1988, and 28 U.S.C. §§ 2201, *et. seq.* The Court has jurisdiction under 28 U.S.C. §§ 1331 and 1343.

2.      Venue is proper pursuant to 28 U.S.C. § 1391, in that at all times pertinent to this action all the defendants were residents of the Commonwealth of Kentucky; defendants Childress and Furnish were employed in the County of Hardin, Kentucky; defendant Kentucky Department for Community Based Services, Division of Protection and Permanency and defendant John Ward maintain an office in the County of Hardin, Kentucky; the Curry's reside in Elizabethtown, in the County of Hardin, Kentucky; and a substantial part of the events or omissions giving rise to the claims presented herein occurred in the County of Hardin, Kentucky.

## III.     PARTIES

3.      Plaintiff Josiah Curry is a citizen of the United States of America, who resides in the City of Elizabethtown, in the County of Hardin, in the Commonwealth of Kentucky. Josiah is the husband of Plaintiff Holly Curry, and the biological father of Plaintiffs V.C., R.C., Ad.C., C.C., H.C., and An.C.

4.      Plaintiff Holly Curry is a citizen of the United States of America, who resides in the City of Elizabethtown, in the County of Hardin, in the Commonwealth of Kentucky. Holly is

the wife of Plaintiff Josiah Curry, and the biological mother of Plaintiffs V.C., R.C., Ad.C., C.C., H.C., and An.C.

5.     V.C., born in 2011, is the minor, biological daughter of Plaintiffs Josiah Curry and Holly Curry. At all times at issue in this complaint, V.C. resided with the Curry's in their home in Elizabethtown, Kentucky.

6.     R.C., born in 2012, is the minor, biological son of Plaintiffs Josiah Curry and Holly Curry. At all times at issue in this complaint, R.C. resided with the Curry's in their home in Elizabethtown, Kentucky.

7.     Ad.C., born in 2015, is the minor, biological daughter of Plaintiffs Josiah Curry and Holly Curry. At all times at issue in this complaint, Ad.C. resided with the Curry's in their home in Elizabethtown, Kentucky.

8.     C.C., born in 2015, is the minor, biological daughter of Plaintiffs Josiah Curry and Holly Curry. At all times at issue in this complaint, C.C. resided with the Curry's in their home in Elizabethtown, Kentucky.

9.     H.C., born in 2016, is the minor, biological daughter of Plaintiffs Josiah Curry and Holly Curry. At all times at issue in this complaint, H.C. resided with the Curry's in their home in Elizabethtown, Kentucky.

10.     An.C., born in 2016, is the minor, biological son of Plaintiffs Josiah Curry and Holly Curry. At all times at issue in this complaint, An.C. resided with the Curry's in their home in Elizabethtown, Kentucky.

11.     Defendant Kentucky Cabinet for Health and Family Services ("the Cabinet") is an agency of the Commonwealth of Kentucky located at 275 E. Main Street, 5W-A, Frankfort, KY 40621.

12.     The Cabinet is vested with authority to promulgate administrative regulations to implement the provisions of the Kentucky Unified Juvenile Code, and is vested with authority to promulgate administrative regulations to implement the provisions of Chapter 620 of the Kentucky Revised Statutes, "Dependency, Neglect, and Abuse."

13.     Defendant Vickie Yates Brown Glisson ("Secretary Glisson") is the Secretary of the Kentucky Cabinet for Health and Family Services, with an office located at 275 E. Main Street, 5W-A, Frankfort, KY 40621.

14.     Secretary Glisson was appointed as Secretary of the Kentucky Cabinet for Health and Family Services by Governor Matthew G. Bevin on December 9, 2015.

15.     In her official capacity, Secretary Glisson is vested with authority to formulate, promote, establish, and execute policies, plans, and programs and to adopt, administer, and enforce all applicable state laws and administrative regulations necessary to protect, develop, and maintain the health, personal dignity, integrity, and sufficiency of the citizens of the Commonwealth and to operate the programs and fulfill the responsibilities vested in the cabinet.

16.     On information and belief, Secretary Glisson was operating in her official capacity as Secretary of the Kentucky Cabinet for Health and Family Services from March 31, 2017 through July 7, 2017.

17.     Defendant Kentucky Department for Community Based Services, Division of Protection and Permanency ("DPP"), is a division of the Kentucky Cabinet of Health and Family Services with a regional office located at 445 U.S. Highway 44E, Suite 208, Shepherdsville, KY 40165, and a local office located at 916 North Mulberry Street, Elizabethtown, KY 42701-3628.

18.     Defendant Jeannetta Childress was, at all times referred to herein, employed as an investigative social worker by the Kentucky Department for Community Based Services, Division of Protection and Permanency.

19.     On information and belief, Investigator Childress was acting as a social service investigator for the Kentucky Department for Community Based Services, Division of Protection and Permanency, from March 31, 2017 through July 7, 2017.

20.     On information and belief, Investigator Childress acted under color of the laws, statutes, ordinances, regulations, policies, customs, and usages of the Commonwealth of Kentucky and the County of Hardin in her dealings with the Curry's from March 31, 2017 through July 7, 2017.

21.     Plaintiffs sue Investigator Childress in her individual capacity only.

22.     Defendant Michael Furnish was, at all times referred to herein, employed as a Deputy Sheriff for the Hardin County Sheriff's Office, located at 150 North Provident Way, Suite 101, Elizabethtown, KY 42701.

23.     On information and belief, Deputy Furnish was acting as a Deputy Sheriff for the Hardin County Sheriff's Office, on March 31, 2017.

24.     On information and belief, Deputy Furnish acted under color of the laws, statutes, ordinances, regulations, policies, customs, and usages of the Commonwealth of Kentucky and the County of Hardin in his dealings with the Curry's on March 31, 2017.

25.     Plaintiffs sue Deputy Furnish in his individual capacity only.

26.     Defendant John Ward was elected Sheriff of Hardin County, Kentucky in 2014.

27.     In his official capacity, Sheriff Ward is the policy maker for the Hardin County Sheriff's Office, a law enforcement agency of the County of Hardin, Kentucky.

28.     On information and belief, Sheriff Ward was acting as Sheriff of Hardin County on March 31, 2017.

29.     Plaintiffs sue Sheriff Ward in his official capacity only.

### IV.     FACTUAL ALLEGATIONS

#### A.     Kentucky law and Cabinet regulations on
#### Non-emergent social service investigations

30.     The Kentucky legislature has promulgated extensive directives in Chapter 620 of the Kentucky Revised Statutes to govern child welfare investigations conducted by law enforcement officers and agents of the Kentucky Cabinet for Health and Family Services.

31.     Pursuant to KY. REV. STAT. §§ 605.150(1) and 620.180(1), the Cabinet is vested with authority to promulgate administrative regulations to implement the provisions of the Kentucky Unified Juvenile Code, including Chapter 620 of the Kentucky Revised Statutes.

32.     Pursuant to KY. REV. STAT. § 194A.050(1), the Secretary is vested with authority to formulate, promote, establish, and execute policies and to adopt, administer, and enforce all applicable state laws and administrative regulations to fulfill the responsibilities vested in the cabinet.

33.     The legislature defines "abused or neglected child" for purposes of Chapter 620 to include a child whose parent does not provide the child with adequate care, supervision, food, clothing, shelter, and education or medical care necessary for the child's well-being, KY. REV. STAT. § 600.020(1)(a)(8), and a child whose parent creates or allows to be created a risk of physical or emotional injury to the child by other than accidental means. KY. REV. STAT. § 600.020(1)(a)(2).

34.     The legislature defines "physical injury" to mean substantial physical pain or any impairment of physical condition. KY. REV. STAT. § 600.020(49).

35.     If the Cabinet receives a report alleging abuse or neglect by a parent, the Cabinet is required to make an initial determination as to the risk of harm and immediate safety of the child. KY. REV. STAT. § 620.040(1).

36.     The Secretary and Cabinet have promulgated acceptance criteria for reports of abuse or neglect in 922 KY. ADMIN. REGS. 1:330.2(4)(a) and (b).

37.     The Cabinet's regulations state that a report does not require a child protective services investigation if the problem described in the report does not meet the statutory definition of abuse, neglect, or dependency. 922 KY. ADMIN. REGS. 1:330.2(5)(c).

38.     If a report does not meet an acceptance criterion, the Cabinet states it shall not accept that report for investigation. 922 KY. ADMIN. REGS. 1:330.2(3)(a).

39.     If the report of child neglect indicates nonimminent danger of physical abuse, the Cabinet shall make efforts to have face-to-face contact with the child and family within twenty-four (24) hours. 922 KY. ADMIN. REGS. 1:330.3(3).

40.     If the report of child neglect indicates nonimminent danger, not involving physical abuse, the Cabinet shall make efforts to have face-to-face contact with the child and family within forty-eight (48) hours. 922 KY. ADMIN. REGS. 1:330.3(4).

41.     The Cabinet's regulations state that a written assessment shall be completed by the cabinet on every investigation. 922 KY. ADMIN. REGS. 1:330.3(8)(a).

42.     The legislature has specifically addressed the actions investigators may take if they are denied admission to the location of a child who is a subject of a report of abuse or neglect, in KY. REV. STAT. § 620.040(5)(a).

43.     The legislature has declared that if the cabinet or its designated representative cannot gain admission to the location of the child to conduct an investigation, a search warrant shall be requested from the judge upon probable cause that the child is dependent, neglected, or abused. KY. REV. STAT. § 620.040(5)(a).

44.     The Secretary and the Cabinet have promulgated a regulation which states as follows: "If there is reason to believe a child is in imminent danger, or if a parent or caretaker of a child refuses the cabinet entry to a child's home or refuses to allow a child to be interviewed, the cabinet may request assistance: (a) From law enforcement; or (b) Through a request for a court order pursuant to KY. REV. STAT. § 620.040(5)(a)." 922 KY. ADMIN. REGS. 1:330.3(20).

### B.     Initial stop and investigation by the Elizabethtown police department

45.     On Thursday, March 30, 2017, at about 9:30 A.M., Plaintiff Holly Curry left her home with her six minor children, V.C., R.C., Ad.C., C.C., H.C., and An.C., to take V.C. and R.C. to karate practice.

46.     Holly was driving a Ford Transit 150 XLT, a 10-passenger vehicle with tinted windows.

47.     On her way to the practice, Holly parked her vehicle outside Cobbler's Café on East Dixie Avenue in Elizabethtown, across the street from the Hardin County Justice Center.

48.     Law enforcement patrol cars are regularly passing by or parking near the Hardin County Justice Center.

49.     Holly felt that her children would be safe with the high amount of law enforcement personnel who are in the vicinity of Cobbler's Café.

50.     Holly left her children in her vehicle with the doors locked, the engine running, and the fan on, and entered Cobbler's Café to purchase a coffee for herself and some muffins for her children.

51.     The weather in Elizabethtown, Kentucky, on the morning of March 30, 2017, was partly cloudy, with an exterior temperature between 66 and 68 degrees Fahrenheit, and winds of between 12 and 17 miles per hour.

52.     Holly was inside the cafe for between five and ten minutes.

53.     When Holly returned to her vehicle, she was met by two men in uniform.

54.     On information and belief, both men were on duty and acting as law enforcement officers of either the Hardin County Sheriff's Office or the Elizabethtown Police Department.

55.     When Holly addressed the officers, they rebuked her for leaving her children in the van.

56.     Holly asked the officers if she could check on the children and give them the food she had brought with her.

57.     The officers allowed Holly to check on her children and to provide them with food.

58.     Holly checked on her children, who were safe and sound within the vehicle.

59.     Holly provided the children with muffins, then shut the van door and returned to the officers who were now standing at the rear of the vehicle.

60.     Holly asked the officers if she was under arrest, and was told "not now, but you're being detained."

61.     Holly asked if she could call her husband, and was told "not now."

62.     Holly, who was feeling very distraught during this encounter, began to cry.

63.     The officers then left Holly to speak to another officer, Officer McMillen, who had just arrived in a marked patrol car.

64.     Officer McMillen asked Holly for her name and address, as well as the children's names and dates of birth, which Holly provided to him.

65.     On information and belief, Officer McMillen recorded the names and dates of birth of the children that Holly provided to him.

66.     None of the officers asked Holly if she could open the van door so they could see the children.

67.     None of the officers told Holly that they believed her children were in any danger or in need of physical assistance.

68.     The officers did not arrest Holly.

69.     Holly was never charged with a crime for leaving her children in a locked van, with the engine and fan running, outside Cobbler's Cafe.

70.     In the Commonwealth of Kentucky, it is not illegal to leave a child in a vehicle for five to ten minutes under safe conditions.

71.     On the morning of March 30, 2017, the Curry children were not in any imminent danger, experiencing any substantial physical pain, suffering from any impairment of physical condition, or exposed to any serious health or safety hazard inside the Curry's vehicle.

72.     Officer McMillen then explained to Holly that she was free to go, but that he would be filing a "JC3 form" with the Kentucky Department for Community Based Services, Division of Protection and Permanency.

73.     A "JC3 form" is a Child Abuse, Adult Abuse, and Domestic Abuse Standard Report.

74.     Officer McMillen told Holly that the DPP would send someone to Holly's home, because a home visit was the standard response whenever a JC3 form is filed.

75.     Holly then took her children to their karate class, and returned home with her children after the class concluded.

76.     On information and belief, Officer McMillen filed a JC3 form against Holly Curry with the Kentucky Department for Community Based Services, Division of Protection and Permanency in Elizabethtown, Kentucky, on Thursday, March 30, 2017.

77.     On information and belief, Officer McMillan's report provided the DPP with the information he had collected from his interview with Holly, including the names and dates of birth of the Curry children.

78.     On information and belief, the DPP placed the information provided by Officer McMillan in a local file for the Curry children, kept and maintained by the DPP.

79.     On information and belief, the DPP assigned the local file on the Curry children to Defendant Jeanetta Childress, an investigative social worker with the DPP.

80.     Neither Investigator Childress nor any other employee of the DPP contacted Holly Curry on Thursday, March 30, 2017.

### C.     Investigator Childress and Deputy Furnish's Warrantless Entry into the Curry's Home on March 31, 2017

81.     On Friday, March 31, at approximately 3:40 P.M., Holly was at home, reading with her oldest two children, V.C., and R.C., while her youngest four children, Ad.C., C.C., H.C., and An.C., were asleep.

82.     Holly, V.C., and R.C. were interrupted by a loud banging on the front door of their home.

83.     Holly asked V.C., and R.C. to remain where they were, and answered the door.

84.     When Holly answered the door, she was confronted by Investigator Childress.

85.     Investigator Childress neither identified herself nor provided credentials.

86.     Investigator Childress told Holly that she was there because Holly had left her children in the car the previous day.

87.     Investigator Childress told Holly that she needed to come in and see Holly's children right away.

88.     Investigator Childress then began walking through the door leading into the Curry's home.

89.     Investigator Childress did not express any concerns about the condition of the Curry's home or the imminent safety of the Curry children.

90.     Investigator Childress did not ask Holly for permission to enter the home, and Holly did not give Investigator Childress permission to enter the home.

91.     As Investigator Childress approached the door leading into the home, Holly explained that it was an inconvenient time, that her husband was out of town at a business conference in Knoxville, Tennessee, and that she was not comfortable allowing Investigator Childress into her home while her husband was absent.

92.     Holly asked Investigator Childress if they could reschedule the home visit to another time.

93.     Investigator Childress refused to reschedule the home visit and again insisted that Holly allow her immediate access into the Curry's home.

94.     Holly found Investigator Childress's words, actions, and demeanor to be very confrontational.

- 13 -

95.     Holly politely asked Investigator Childress if she had a warrant.

96.     Investigator Childress said she did not have a warrant.

97.     On information and belief, Investigator Childress did not have a warrant authorizing her to enter the Curry's home on March 31, 2017.

98.     On information and belief, Investigator Childress did not attempt to get a warrant prior to coming to the Curry's home on March 31, 2017.

99.     The Curry children were not in any imminent danger inside the Curry's home on the afternoon of March 31, 2017.

100.    Holly told Investigator Childress that she could not enter her home without a warrant.

101.    Holly did not make any physical contact with Investigator Childress, threaten Investigator Childress, or use coarse language towards Investigator Childress.

102.    On information and belief, Investigator Childress did not believe that Holly or anyone else in the Curry's home posed any safety risk to Investigator Childress.

103.    Investigator Childress repeated that she needed to come in, and Holly again told Investigator Childress that she could not enter her home without a warrant.

104.    Investigator Childress then told Holly, "Fine. I'll go get the police."

105.    As Investigator Childress was walking away, she turned around and asked if all six children were home.

106.    Holly confirmed the children were at home.

107.    Investigator Childress then told Holly that she would mark this down "as a refusal," and would go get the police.

- 14 -

108.    On information and belief, after Investigator Childress left the Curry's home she contacted the Hardin County Sheriff's Office and conveyed that Holly had refused to allow Investigator Childress to enter the Curry's home.

109.    On information and belief, Investigator Childress requested that the Hardin County Sheriff's Office send an officer to assist her in gaining entry into the Curry's home.

110.    On information and belief, Investigator Childress did not request assistance from the Hardin County Sheriff's Office because she felt her safety was threatened or endangered while at the Curry's home.

111.    On information and belief, Investigator Childress's request for assistance was made in reliance upon 922 KY. ADMIN. REGS. 1:330.3(20), in which the Secretary and Cabinet state that if a parent refuses the cabinet entry to a child's home, even in non-emergency situations, the cabinet may request assistance from law enforcement **instead** of seeking a court order pursuant to KY. REV. STAT. § 620.040(5)(a).

112.    On information and belief, the Hardin County Sheriff's Office has a policy or custom of sending officers to assist when a social service investigator asks for assistance because a parent refuses the cabinet entry to a child's home, even in non-emergency situations.

113.    On information and belief, the Hardin County Sheriff's Office agreed to assist Investigator Childress by sending a deputy with her to the Curry's home.

114.    On information and belief, Deputy Furnish was on duty and acting within the scope of his employment on the afternoon of March 31, 2017.

115.    On information and belief, the Hardin County Sheriff's Office dispatched Deputy Furnish for the purpose of assisting Investigator Childress in gaining entry into the Curry's home.

116.    Around 5:00 P.M. EST, Holly heard another knock at her door.

117.    When Holly answered the door, she was confronted by Investigator Childress and Deputy Furnish.

118.    Deputy Furnish was armed with his service weapon, and was in uniform.

119.    Deputy Furnish was standing directly in front of the door, with Investigator Childress to his side.

120.    Holly felt physically intimidated by Deputy Furnish, who was much larger and taller than she was.

121.    Standing next to Deputy Furnish, Investigator Childress repeated her demand that Holly allow her to enter the Curry's home.

122.    When Holly asked if Investigator Childress had a warrant, Deputy Furnish interjected, "No."

123.    Holly repeated that they did not have permission to enter her home without a warrant.

124.    Holly did not make any physical contact with, threaten or use coarse language towards Investigator Childress or Deputy Furnish.

125.    When Holly repeated that they did not have permission to enter her home without a warrant, Deputy Furnish told Holly, "We need to enter your home now."

126.    Deputy Furnish did not tell Holly that he was simply there to keep the peace.

127.    On information and belief, Deputy Furnish did not believe that Holly or anyone else in the Curry's home posed any safety risk to himself or to Investigator Childress.

128.    On information and belief, neither Investigator Childress nor Deputy Furnish had a warrant authorizing them to enter the Curry's home on March 31, 2017.

- 16 -

129.    On information and belief, neither Investigator Childress nor Deputy Furnish had attempted to get a warrant prior to coming to the Curry's home on March 31, 2017.

130.    Holly offered to bring all six children to the door so Investigator Childress and Deputy Furnish could see they were safe and healthy, but reiterated that they did not have her permission to enter the home.

131.    Neither Investigator Childress nor Deputy Furnish asked Holly to bring the children to the door.

132.    Had Investigator Childress or Deputy Furnish accepted Holly's offer to view the children through the front door, they would have seen that the children were in good health and were not in any imminent danger.

133.    Investigator Childress said that Holly was "making this harder than it has to be."

134.    Deputy Furnish then told Holly, "Fine. We'll just go get an ECO."

135.    When Holly asked what an ECO was, Deputy Furnish told her it was an Emergency Custody Order.

136.    Deputy Furnish then told Holly that when they got an ECO, they would return to the house and take all her children.

137.    Holly was stunned that Investigator Childress and Deputy Furnish would threaten to remove her children if she refused to allow them entry into her home without a warrant.

138.    Holly was on the verge of sobbing, but did not cry out because she did not want to scare her children, who were just behind her inside the home.

139.    Investigator Childress and Deputy Furnish repeated that Holly had to let them enter the home or they would get an ECO and return to remove the children.

140.    Investigator Childress and Deputy Furnish asked Holly "what's it gonna be?" three times, in increasingly loud and aggressive tones.

141.    Holly was very distressed by this point, and found herself choking and unable to speak.

142.    Holly felt violated and threatened by Officer Furnish's threat to remove the children from her home if she did not allow him to enter.

143.    Holly was unable to turn to her husband for support or counsel during this time because he was out-of-town.

144.    Holly believed that if she continued to insist that Investigator Childress and Deputy Furnish produce a warrant, they would enter the home anyway over her objection and remove all six children from the home.

145.    Holly was afraid that her children would be frightened if Investigator Childress and Deputy Furnish forcibly removed them from the Curry's home.

146.    Holly was afraid that her children might be physically or emotionally injured if Investigator Childress and Deputy Furnish forcibly removed them from the Curry's home.

147.    Holly was afraid that if her children were forcibly removed from the Curry's home, they would be placed in foster care.

148.    Holly was afraid that if her children were forcibly removed from the Curry's home, she would be separated from them for an indeterminate period of time.

149.    Holly was particularly concerned about being separated from her two youngest children, who were just infants, for an indeterminate period of time.

150.    Because of her fear that her children would be forcibly taken from her, Holly did not feel free to continue to resist Investigator Childress and Deputy Furnish's demands to enter her home without a warrant.

151.    When Investigator Childress and Deputy Furnish asked Holly "what's it gonna be?" a fourth time, Holly managed to say "okay, fine, we can do this," raised her hand as a sign of surrender, and stepped away from the doorway.

152.    Holly was crying as she stepped away from the door.

153.    The only reason Holly stepped away from the door was to placate Investigator Childress and Deputy Furnish so they would not remove her children from the home.

154.    As Holly stepped away from the doorway, Investigator Childress and Deputy Furnish crossed over the threshold and entered the Curry's home.

### D.    Defendant Childress's Seizure of V.C.

155.    When Investigator Childress entered, she asked Holly to identify the oldest child.

156.    Deputy Furnish, who was still armed and in uniform, was standing in the room near Investigator Childress.

157.    In response to Investigator Childress's question, Holly identified V.C.

158.    Investigator Childress then took V.C. by the hand, and told V.C. that they were going away from Holly.

159.    Investigator Childress led V.C. into V.C.'s bedroom and shut the door behind them.

160.    Investigator Childress did not ask for or obtain consent from Holly to enter V.C.'s bedroom, or to question V.C.

161.    Holly did not consent to allowing Investigator Childress to enter V.C.'s bedroom, or to question V.C.

162.    Holly did not want Investigator Childress to remove V.C. from her presence, but was afraid that Deputy Furnish would remove V.C. and the other five children if she voiced her objection.

163.    On information and belief, Investigator Childress proceeded to question V.C. in V.C.'s bedroom.

164.    On information and belief, Investigator Childress asked V.C. questions about Holly, Josiah, and life within the Curry household.

165.    On information and belief, Investigator Childress learned details about life within the Curry household through her questioning of V.C.

166.    On information and belief, Investigator Childress recorded V.C.'s answers to those questions.

167.    On information and belief, Investigator Childress did not have a search warrant or court order authorizing her to question V.C. or any of the Curry children on March 31, 2017.

168.    On information and belief, Investigator Childress did attempt to procure a search warrant or court order authorizing her to question V.C. or any of the Curry children.

169.    Because Defendant Childress had closed the door to V.C.'s bedroom behind them, V.C. could not leave Defendant Childress and return to her mother.

170.    Because Defendant Childress had closed the door to V.C.'s bedroom behind them, V.C. did not feel free to leave Defendant Childress and return to her mother.

171.    While Investigator Childress was questioning V.C., Deputy Furnish remained with Holly in the living room of the Curry's home.

172.    Holly asked Deputy Furnish if she could go downstairs to tend to H.C. and An.C., who were playing in playpens.

173.    Holly asked Deputy Furnish if she could go downstairs because she did not feel free to move about in her own home without his permission.

174.    Holly asked Deputy Furnish if she could go downstairs because she was afraid that if she did something else that he did not like, he would remove her children from the Curry's home.

175.    Holly went downstairs, where she waited with her other five children while Investigator Childress concluded her questioning of V.C. in the bedroom, behind closed doors.

### E.    Investigator Childress and Deputy Furnish's Warrantless Strip Searches of V.C., R.C., Ad.C., C.C., H.C., and An.C.

176.    When Investigator Childress finished her questioning of V.C., she came down to the basement, accompanied by Deputy Furnish, and told Holly, "I need to take a look at the kids now."

177.    Investigator Childress then took H.C. from Holly's lap and removed H.C.'s clothes and diaper in the presence of Holly and Deputy Furnish.

178.    Investigator Childress did not ask for Holly's permission to take H.C. or to remove her clothes and diaper.

179.    Holly did not want Investigator Childress to take H.C. or to remove her clothes and diaper, but felt powerless to resist because she was afraid that Deputy Furnish would remove V.C. and the other five children if she raised any objection.

180.    Investigator Childress then returned H.C. to Holly and commented that she had a wet diaper.

181.    Investigator Childress did not express any concerns about H.C.'s health, safety or well-being.

182.    Investigator Childress then took An.C. and removed his clothes and diaper

183.    As she was doing so, Holly told Investigator Childress that An.C. had a diaper rash.

184.    Investigator Childress said it was "okay."

185.    Investigator Childress did not express any concerns about An.C.'s health, safety or well-being.

186.    Investigator Childress next removed the snap-bottom shirts from C.C. and Ad.C., removed their pants, and looked in their diapers.

187.    While Investigator Childress was removing her clothes, C.C. became very upset, started crying, and pushed Investigator Childress's hands away from her.

188.    Investigator Childress did not express any concerns about C.C. or Ad.C.'s health, safety or well-being.

189.    Investigator Childress then asked R.C. to take off his shirt.

190.    R.C. attempted to make eye contact with Holly to ask if it was okay.

191.    R.C. attempted to make eye contact with Holly because the Curry family's pediatrician, Dr. Beckford, had told R.C. during a physical exam that no adult should ever ask him to undress without his mommy's (Holly's) permission.

192.    R.C. attempted to make eye contact with Holly because Dr. Beckford had told R.C. during a physical exam that any adult, including her, should always have his mommy's (Holly's) permission before looking at his penis.

- 22 -

193.    When Investigator Childress saw R.C. look at Holly, she stepped in front of Holly so R.C. could not see Holly.

194.    Investigator Childress then pointed to Deputy Furnish and told R.C., "Show that cop your muscles!"

195.    R.C. complied with Investigator Childress's command, took off his shirt, and flexed his muscles.

196.    Deputy Furnish and Investigator Childress chuckled.

197.    Investigator Childress then lifted R.C.'s pant legs, pulled his pants down, and looked into the front and back of his underwear.

198.    Investigator Childress then lifted V.C.'s pant legs, pulled her pants down, and looked into the front and back of her underwear.

199.    At no time during these strip searches did Investigator Childress ask Holly for permission to examine the children.

200.    At no time during these strip searches did Holly give Investigator Childress permission to examine her children.

201.    Deputy Furnish remained in the basement, in the presence of Investigator Childress and Holly and in sight of all six children, through all six strip searches.

### F.    Investigator Childress's Assessment of the Curry Family

202.    After Investigator Childress completed her strip searches of V.C., R.C., Ad.C., C.C., H.C., and An.C., Holly told Investigator Childress that she wanted to call her husband, Josiah Curry.

203.    Holly's mobile phone was sitting on the Curry's couch, near Investigator Childress.

- 23 -

204.    Investigator Childress scooted over and sat on Holly's mobile phone while she filled out paperwork.

205.    On information and belief, this paperwork was an assessment of the Curry family.

206.    Investigator Childress asked Holly if the Curry family was religious.

207.    When Holly responded that they were Catholic, Investigator Childress laughed and said, "You're the second Catholic family I've interviewed in two days!"

208.    Investigator Childress asked Holly if any of the children were enrolled in school.

209.    Holly replied that none of the children were of compulsory attendance age, but that she and her husband planned to homeschool them.

210.    Investigator Childress stated that she was concerned that the Curry's were planning to homeschool, but did not elaborate on those concerns.

211.    Investigator Childress asked Holly whether the children were up to date on their immunizations, and Holly confirmed that they were.

212.    Investigator Childress asked Holly if the children had a pediatrician, and Holly confirmed that her children had been seen by Dr. Beckford, Dr. Waris, and Dr. Saifullah.

213.    Investigator Childress then asked Holly if she or the children were on any medications, and Holly provided her with a list of medications.

214.    Investigator Childress then demanded that Holly sign a form releasing the children's medical records to the DPP.

215.    Investigator Childress pressured Holly to sign the medical release form before Holly could finish reading it.

216.    Deputy Furnish was in the room with Investigator Childress and Holly, as Holly was reviewing the medical release form.

217.    Holly signed the medical release form because she believed that if she did not do so, Investigator Furnish and Deputy Furnish would remove her children from the home.

218.    On information and belief, Investigator Childress used the medical release form that Holly had signed to obtain additional medical records and other confidential health information about the Curry children from Dr. Beckford, Dr. Waris, and Dr. Saifullah.

219.    Investigator Childress asked Holly to provide social security numbers for her and all six of the children.

220.    Holly provided Investigator Childress with her social security number, but told Investigator Childress that she did not have the children's social security numbers available.

221.    As she was preparing to leave, Investigator Childress said to Holly, "Oh, I forgot to look. Do you have fire alarms here?"

222.    Holly responded that the Curry's did have fire alarms in their home.

223.    Holly then asked Investigator Childress what would happen if there were findings of neglect.

224.    Investigator Childress told Holly, "You'll never be allowed to work with children or be around them again."

225.    Investigator Childress and Deputy Furnish then left the Curry's home.

226.    On information and belief, sometime after Investigator Childress left the Curry's home, she prepared an assessment of the Curry family.

227.    On information and belief, Investigator Childress recorded Holly's answers regarding the Curry family's religious beliefs, intention to homeschool, immunization and medication information, Holly's social security number, and other information she had obtained from her entry into the Curry's home in her assessment of the Curry family.

- 25 -

228.    On information and belief, Investigator Childress's assessment is currently kept and maintained by the DPP in the Curry's local file, along with Officer McMillan's initial report, the medical release form that Holly signed on March 31, 2017, and medical records and other confidential information obtained by Investigator Childress from Dr. Beckford, Dr. Waris, and Dr. Saifullah through the use of the medical release form.

229.    Investigator Childress called Josiah Curry on or about May 12, 2017, forty-three (43) days after her entry into the Curry's home.

230.    This was Investigator Childress's first attempt to contact Josiah Curry about the events of March 30, 2017.

231.    On information and belief, Investigator Childress recorded notes on her conversation with Josiah, which she added to her assessment of the Curry family.

232.    During this conversation, Investigator Childress told Josiah that none of the allegations against the Curry's would be substantiated.

233.    Investigator Childress told Josiah that if the Curry's were reported to CPS again, "bad things are going to happen, and we could take the kids away."

234.    On June 1, 2017, Investigator Childress called Holly on the phone and told her, "We're not going to substantiate findings for you this time, because we think it was a one-time 'oopsy-daisy.'"

235.    On July 7, 2017, Investigator Childress confirmed to Holly on the phone that the matter was closed as unsubstantiated.

236.    On information and belief, the DPP closed the investigation into the Curry family based upon Investigator Childress's assessment that the allegations were unsubstantiated.

237.    On information and belief, the DPP retains a copy of Investigator Childress's assessment in a local file maintained by the DPP.

238.    On information and belief, Investigator Childress's assessment and any other documents retained in the DPP's local file on the Curry family are accessible to and reviewable by agents and employees of the DPP and the Cabinet.

## V.    CAUSES OF ACTION

### FIRST CAUSE OF ACTION
**Violation of Fourth Amendment – Warrantless Home Entry**
**(By All Plaintiffs against Defendants Childress and Furnish in their Individual Capacities)**

239.    Plaintiffs incorporate by reference every allegation in paragraphs 1 through 238.

240.    The Fourth Amendment provides that "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and that no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. Amend. IV.

241.    On March 31, 2017, Defendants Childress and Furnish entered the Curry's private home without obtaining a warrant supported by probable cause, and without attempting to obtain a warrant supported by probable cause or affirmation. On that date, it was clearly established that police and social service investigators who intrude into a private home without a warrant by even a fraction of an inch presumptively and per se violate the Fourth Amendment.

242.    On March 31, 2017, Defendants Childress unlawfully overcame Holly's repeated statements that she could not enter the Curry's home without a court order by obtaining the assistance of Defendant Furnish, an armed and uniformed police officer. Both Defendants Childress and Furnish overcame Holly's steadfast refusal by threatening to remove all of the

Curry children unless Holly relented. Any reasonable officer would have known that threatening a mother with the removal of her six small children (including two infants) would undermine the mother's resolve to assert her Fourth Amendment rights, and contaminate the voluntariness of any subsequent permission to enter with duress and coercion. Any reasonable officer would also have known that Deputy Furnish could not have sought an emergency custody order under Kentucky law based solely on the refusal of a parent to allow access to a child, and that any acquiescence extorted from a parent on that basis could not be intelligently given.

243.   On March 31, 2017, nothing Defendants Childress and Furnish knew from the initial report or discovered at the scene would have led a reasonable officer to conclude that their warrantless entry fell within a clearly defined and well-delineated exception to the warrant requirement. Investigator Childress's investigation was prompted by a single, past incident the day before, where no harm occurred or was alleged. When Investigator Childress and Deputy Furnish demanded entry to the Curry's home, Holly asserted her constitutional right to be free from a warrantless entry into her home, but offered to let Investigator Childress and Deputy Furnish view her children from outside the home to verify that they were not in any imminent danger. And neither Investigator Childress nor Deputy Furnish had any reason to believe that Holly posed a threat to officer safety while they were at the scene.

244.   As a result of defendants' acts as described above, defendants deprived Josiah Curry, Holly Curry, V.C., R.C., Ad.C., C.C., H.C., and An.C. of their Fourth Amendment right to be secure in their home from unreasonable searches and seizures.

245.   Plaintiffs allege that as a result of the violations of their civil rights described above, Josiah Curry, Holly Curry, V.C., R.C., Ad.C., C.C., H.C., and An.C. each have suffered and will continue to suffer for an as yet undetermined length of time the following:

a.  Mental pain and suffering;

b.  Emotional distress; and

c.  Loss of enjoyment of life.

## SECOND CAUSE OF ACTION
### Violation of Fourth Amendment – Warrantless Seizure
### (By V.C. against Defendant Childress in her Individual Capacity)

246.   Plaintiffs incorporate by reference every allegation in paragraphs 1 through 245.

247.   On March 31, 2017, Defendant Childress took V.C. by the hand, led V.C. into a private bedroom in the Curry's home, and closed the door behind them. Defendant Childress then proceeded to question V.C. about personal details of the Curry household, while physically separating V.C. from her mother, Holly Curry, and her siblings R.C., Ad.C., C.C., H.C., and An.C. Because the door behind her was closed, V.C. could not leave Defendant Childress, and did not feel free to leave Defendant Childress and return to her mother, Holly Curry.

248.   On March 31, 2017, it was clearly established that an investigative social worker who removes a child from the presence of the child's parent seizes that child, and that such a seizure is unlawful unless it complies with the Fourth Amendment. Defendant Childress seized V.C. without a court order and without attempting to procure a court order beforehand, rendering that seizure presumptively unconstitutional. Defendant Childress also did not seek or obtain the consent of V.C.'s parent, Holly Curry, before she seized and removed V.C. No reasonable officer would have believed that the immediate and warrantless removal of V.C. from Holly's supervision was necessary to protect V.C.'s health and safety, or justified by any exception to the Fourth Amendment's warrant requirement.

- 29 -

249.    Plaintiffs Josiah Curry and Holly Curry, as parents and next friends of V.C., allege that as a result of the violations of V.C.'s civil rights described above, V.C. has suffered and will continue to suffer for an as yet undetermined length of time the following:

     a.   Mental pain and suffering;

     b.   Emotional distress; and

     c.   Loss of enjoyment of life.

### THIRD CAUSE OF ACTION
### Violation of Fourth Amendment – Six Warrantless Strip Searches
### (By V.C., R.C., Ad.C., C.C., H.C., and An.C. against
### Defendants Childress and Furnish in their Individual Capacities)

250.    Plaintiffs incorporate by reference every allegation in paragraphs 1 through 249.

251.    On March 31, 2017, Defendants Childress and Furnish came to the Curry's home with the express purpose of investigating a report that children had been left unattended the previous day in a running, locked vehicle for five to ten minutes, across the street from a police station. After threatening to remove all six children unless they were granted immediate entry, and removing a child to conduct an interview behind closed doors, Defendant Furnish observed while Defendant Childress removed clothing from all six children and inspected their genitalia in the presence of Deputy Furnish.

252.    Any reasonable officer would have instantly understood the illegality of each and every one of these six strip searches. A strip search implicates the core protection of the Fourth Amendment—the right to be secure in one's **person**—and does so in a way that is especially humiliating and intrusive. No reasonable officer would have believed that intrusion was necessary given the circumstances on March 31, 2017. There were no allegations that any of the Curry children were victims of sexual abuse, or that they had markings consistent with physical

abuse that were obscured by their outer clothing or undergarments. Nothing Defendants Childress and Furnish had seen in the Curry's home created any reasonable inference that would justify a strip search of any of the children, much less all six. Investigator Childress and Deputy Furnish never asked for or obtained Holly's consent to strip search any of the children, did not attempt to obtain a court order, or even consulted with their supervisors before they strip searched the Curry children.

253.    In addition, no reasonable officer would have believed it was legal to conduct a strip search of six children, of both genders, in the presence of both a male and female investigator. It is well established that the Fourth Amendment protects with special force the right to shield one's body from exposure to viewing by members of the opposite sex. Defendants Childress and Furnish instead engaged in strip searches which exposed the genitalia of V.C., Ad.C., C.C., and H.C. to Defendant Furnish who was male, and exposed the genitalia of R.C. and An.C. to Defendant Childress who was female.

254.    Plaintiffs Josiah Curry and Holly Curry, as parents and next friends of their minor children, allege that as a result of the violations of their civil rights described above, V.C., R.C., Ad.C., C.C., H.C., and An.C. have suffered and will continue to suffer for an as yet undetermined length of time the following:

      a.   Mental pain and suffering;

      b.   Emotional distress; and

      c.   Loss of enjoyment of life.

### FOURTH CAUSE OF ACTION
### Violation of Fourteenth Amendment – Unlawful Threat to Remove the Children
### (By All Plaintiffs against Defendants Childress and Furnish in their Individual Capacities)

255.    Plaintiffs incorporate by reference every allegation in paragraphs 1 through 254.

256.    On March 31, 2017, Defendants Childress and Furnish converged on the Curry's home with the goal of entering to examine and strip search the Curry's children. When Holly told them they did not have permission to enter, Defendants Furnish and Childress said that if she did not let them in, they would get an emergency custody order and remove her children.

257.    In the Commonwealth of Kentucky, the legal standard for obtaining an Emergency Custody Order is governed by KY. REV. STAT. § 620.060(1). A threat to obtain an Emergency Custody Order is only lawful under Kentucky law if there are reasonable grounds to believe that a child is in imminent danger of death or serious physical injury or is being sexually abused; if a parent has repeatedly inflicted non-accidental physical injury or emotional injury on a child; or if the child is in immediate danger due to the parent's failure or refusal to provide for the safety or needs of the child. To legally obtain an emergency custody order, at least one of these three criteria must be met. An emergency custody order **cannot** be legally issued if the sole basis for seeking the order is a parent's refusal to provide access to a child or to cooperate with a social service investigation.

258.    Based on the information obtained from Officer McMillan, neither Investigator Childress nor Deputy Furnish had any reason to believe that they could lawfully obtain an emergency custody order. There were no allegations or evidence that any of the Curry children were in imminent danger of death or serious physical injury, were victims of sexual abuse, had suffered repeated non-accidental physical or emotional injuries, or were in any immediate danger due to Holly's failure or refusal to provide for the safety or needs of her children. Nor did anything Investigator Childress or Deputy Furnish learned on the Curry's doorstep give rise to a reasonable belief that any of these legal criteria had been met.

- 32 -

259.    When Defendants Childress and Furnish told Holly that they would obtain an emergency custody order and remove her children unless they complied, they claimed authority for themselves under color of state law that any reasonable officer would have known Kentucky law did not confer. Not only that, but they wrongfully claimed this authority using threatening words and threatening tones, and they threatened Holly in a moment of vulnerability when she was home alone with her children and had no friend or advisor to whom she could turn. In the absence of any reasonable belief that they could obtain an ECO, Investigator Childress and Deputy Furnish's only purpose for threatening to get an ECO was to coerce Holly into allowing them into the Curry's home. This threat is sufficient to implicate the Curry's liberty interest in familial relationship protected by the Fourteenth Amendment.

260.    Josiah Curry and Holly Curry, individually and as parents and next friends of V.C., R.C., Ad.C., C.C., H.C., and An.C., allege that the plaintiffs have suffered and will continue to suffer for an as yet undetermined length of time the following:

    a.  Mental pain and suffering;

    b.  Emotional distress; and

    c.  Loss of enjoyment of life.

### FIFTH CAUSE OF ACTION
### Violation of Fourteenth Amendment – State Interference with Family Integrity
### (By All Plaintiffs against Defendants Childress and Furnish in their Individual Capacities)

261.    Plaintiffs incorporate by reference every allegation in paragraphs 1 through 260.

262.    On March 31, 2017, Defendants Childress and Furnish demanded entry into the inner sanctum of the Curry's home. As Holly Curry defended her constitutional right to resist that entry, Defendants Childress and Furnish challenged her authority as a parent in front of her two oldest children, and threatened to physically remove all six children from Holly's care and

custody unless she complied with their demands. They persisted again and again, reducing Holly to tears, until she finally moved away from the door. Once inside, Defendants Childress and Furnish reduced Holly to a guest in her own home, as she felt compelled to ask permission before she could move to different parts of the house, and felt powerless to resist any of the demands they made upon her or her children. When Holly's oldest son, R.C., turned to her for help during his strip search, Defendant Childress physically came between mother and child, and issued a command to him that directly contradicted his own sense of privacy and dignity, in addition to the wise training he had received from Holly and his pediatrician. Afraid that her children would be taken away at the slightest provocation, Holly was powerless to stand up for her own rights or the rights of her children in her own home.

263.    By challenging Holly's authority in her own home, and rendering her powerless to make decisions for her own children, Defendants Childress and Furnish not only intruded upon but damaged the privacy and integrity of the Curry family. They communicated to the Curry children that the government was in charge, not their parents. The Curry children needed help and protection, and the government prevented Holly from giving them either. For Defendants Childress and Furnish, Holly's efforts to protect her children simply made things harder than they needed to be. For Holly's children, the moment Holly moved away from the door in order to keep her children was the moment she lost all power to protect them.

264.    Just as no reasonable officer would have believed there was legal justification to enter the Curry's home, remove V.C., or strip search all six children, no reasonable officer would have felt the need to interfere with the integrity of the Curry family based on the information known to Defendants Childress and Furnish at the time. Holly had offered to bring the children to the front door so the Defendants could see them, and had asked to reschedule the visit to a

time when her husband was not out of town. There were no allegations or evidence of immediate danger to the children. There was absolutely no need to undermine Holly's authority in front of her children, no need to render her powerless in her own home, and no need to show her children just how powerless they could make her by performing six separate strip searches.

265.    On March 31, 2017, it was clearly established in this circuit that state interference with the integrity of a family deprives that family of a particular constitutional guarantee under the Fourteenth Amendment: the right of a parent to care for, maintain a relationship with, and ultimately to parent his or her children. No reasonable officer would have believed that defendants Childress or Furnish's warrantless entry, seizure, strip searches, or other investigative tactics were in any way necessary or narrowly tailored to a compelling interest, or otherwise lawful under the Fourteenth Amendment.

266.    Plaintiffs Josiah Curry and Holly Curry, individually and as parents and next friends of V.C., R.C., Ad.C., C.C., H.C., and An.C., allege that as a result of the violations of their civil rights described above, each has suffered and will continue to suffer for an as yet undetermined length of time the following:

     a.    Mental pain and suffering;

     b.    Emotional distress; and

     c.    Loss of enjoyment of life.

**SIXTH CAUSE OF ACTION**
**28 U.S.C. §§ 2201, et. seq. – Declaratory Judgment**
**(By All Plaintiffs against Defendants Kentucky Cabinet for Health and Family Services, Secretary Glisson, and the Kentucky Department for Community Based Services, Division of Protection and Permanency)**

267.    Plaintiffs incorporate by reference every allegation in paragraphs 1 through 266.

268.    The Kentucky Cabinet for Health and Family Services opened an investigation of the Curry family on March 30, 2017. By administrative rule, no such investigation should ever have taken place. Leaving children unattended in a locked, running vehicle on a cool day, outside a police station, is not a crime in the Commonwealth of Kentucky. Neither Officer McMillan nor the other officers who detained Holly Curry outside Cobbler's Cafe had any reason to believe the Curry children were in imminent danger, lacking adequate care or supervision necessary for their well-being, or at risk of substantial physical pain or impairment of physical condition. None of the information in Officer McMillan's report rose to the level of an allegation of abuse or neglect of a child.

269.    Rather than screening Officer McMillen's report out because it did not meet any acceptance criterion set out by the Cabinet, the Cabinet instead opened an investigation of the Curry family and assigned the matter to Defendant Childress. Even though the report contained no allegations amounting to abuse or neglect, and did not contain any reason to believe that the Curry children were in imminent danger, Defendant Childress went to the Curry's home and demanded immediate entrance to see (and, as Holly would later learn, to interview and strip search) the children.

270.    When Holly refused to consent to this home visit, Defendant Childress asked the Hardin County Sheriff's Office to send an armed, uniformed police officer to assist her. Defendant Childress didn't feel threatened and didn't ask for assistance because she felt the Curry's home was unsafe. She asked for assistance from the police because the Secretary and the Cabinet have told social service investigators, in pertinent part, that "[i]f there is reason to believe a child is in imminent danger, **or** if a parent or caretaker of a child refuses the cabinet entry to a child's home **or** refuses to allow a child to be interviewed, the cabinet may request

assistance . . . from law enforcement. . . ." 922 KY. ADMIN. REGS. 1:330.3(20) (emphasis added). Investigator Childress asked the Sheriff's Office to send an officer to assist her in overcoming Holly's refusal, and to gain the cabinet entry into the Curry's home. The Sheriff's Office then sent Deputy Furnish to assist Investigator Childress in overcoming Holly's refusal, and to gain the cabinet entry into the Curry's home.

271.     An administrative regulation that tells an investigative social worker they can gain access to a private residence in a non-emergency situation by asking the police for assistance violates the Fourth and Fourteenth Amendments to the Constitution, both on its face and as applied. The regulation permits case workers to rely on the assistance of officers in non-emergency circumstances, when there are no officer-safety concerns, and when the sole ground for gaining access to the home is the parent's refusal to consent to a home entry or interview, both of which are constitutionally protected.

272.     Because the regulation promulgated by the Secretary and Cabinet violates the Fourth Amendment's prohibition against warrantless, nonconsensual entry into a private home in the absence of probable cause and exigent circumstances, and does violence to the Fourteenth Amendment's recognition of the fundamental liberty interest that children and parents have in family integrity, the Plaintiffs seek a declaratory judgment that 922 KY. ADMIN. REGS. 1:330.3(20) is unconstitutional and void both on its face and as applied to the Curry's.

### SEVENTH CAUSE OF ACTION
### 28 U.S.C. §§ 2201, et. seq. – Equitable Relief – Expungement
### (By All Plaintiffs against Defendants Kentucky Cabinet for Health and Family Services, Secretary Glisson, and the Kentucky Department for Community Based Services, Division of Protection and Permanency)

273.     Plaintiffs incorporate by reference every allegation in paragraphs 1 through 272.

274.     On March 31, 2017, Investigator Childress sought to enter the Curry's home for the purpose of completing an assessment of the Curry family. When Holly denied her access to the home, Investigator Childress enlisted the aid of Deputy Furnish who secured her access to the home by threatening to remove the Curry children unless Holly submitted.

275.     Once she had entered the home, Investigator Childress—relying on Deputy Furnish's continued presence to keep Holly compliant—undertook an extensive assessment of the Curry family. That assessment, which contains names, dates of birth, social security numbers, medical records, and other sensitive identifying information, remains in the care and custody of the Kentucky Cabinet for Health and Family Services, and in the care and custody of the Kentucky Department for Community Based Services, Division of Protection and Permanency, where it is accessible to other agents and employees of the Cabinet and Division.

276.     Because this information remains in the care and custody of the Cabinet and Division, the Curry's seek a declaratory judgment that Investigator Childress and Deputy Furnish entered the Curry's home unlawfully in violation of the Fourth Amendment, and that any information subsequently discovered or seized by Investigator Childress within the Curry's home was discovered or seized unlawfully and should be expunged.

### EIGHTH CAUSE OF ACTION
### Municipal Liability – Unconstitutional Policy or Custom
### (By All Plaintiffs against Sheriff John Ward, in his Official Capacity)

277.     Plaintiffs incorporate by reference every allegation in paragraphs 1 through 276.

278.     On March 31, 2017, Investigator Childress initially attempted to gain entry into the Curry's home on her own. When Holly refused to let her in because she did not have a warrant, Investigator Childress went immediately to the Hardin County Sheriff's Office for assistance. She did so even though she was investigating a situation that had already been

investigated by police the day before, there was no evidence that anyone in the Curry's home was in any imminent danger, and neither Holly nor the condition of the home posed any threat to Investigator Childress's safety. In response to this request, the Sheriff's Office promptly dispatched Deputy Furnish, armed and in uniform, to assist Investigator Childress. Deputy Furnish was an active participant in Investigator Childress's efforts to get inside the Curry's home, and ultimately succeeded by threatening to remove Holly's children from the home if she did not comply. Deputy Furnish then remained in the home during Investigator Childress's seizure of V.C. and strip searches of V.C., R.C., Ad.C., C.C., H.C., and An.C., to ensure that Holly complied with Investigator Childress's demands.

279.    On information and belief, the Hardin County Sheriff's Office dispatched Deputy Furnish to assist Investigator Childress because the Sheriff's Office has a policy or custom of routinely assisting social service investigators who request aid in gaining access into a home. When Holly initially refused to let Investigator Childress into her home without a warrant, Investigator Childress told Holly at least twice that her refusal would result in police intervention: "Fine. I'll go get the police," and she would mark Holly's response down "as a refusal" and go get the police. Investigator Childress's statements treat police assistance as a *fait accompli*, and subsequent events bore out her belief. By 5:00 pm, Investigator Childress was back on the Curry's doorstep with an armed, uniformed deputy. And Deputy Furnish's statements to Holly revealed he had been dispatched by the Sheriff's Office for the purpose of getting Investigator Childress into Holly's home.

280.    The purpose of the Fourth Amendment's warrant requirement is to entrust decisions that implicate core privacy rights—such as the decision of whether it is reasonable to enter a home—in the hands of a neutral magistrate, not an overly-zealous law enforcement

officer. By adopting a policy or custom of routinely assisting social service investigators who want access to a private home—even in non-emergency circumstances—the Hardin County Sheriff's Office has created a heightened risk of sanctioned searches and seizures which violate this cardinal constitutional principle. This is precisely what happened here, when the Sheriff's Office sent Deputy Furnish to assist Investigator Childress in entering the Curry's home, and he accomplished that purpose through a show of authority and an unlawful threat to remove the children. Deputy Furnish's presence and involvement were integral to Investigator Childress's entry into the home, the seizure of V.C., and the strip search of all six Curry children.

281.    Plaintiffs Josiah Curry and Holly Curry, individually and as parents and next friends of V.C., R.C., Ad.C., C.C., H.C., and An.C., allege that their civil rights were violated as described above as a result of the Hardin County Sheriff's Office's unconstitutional policy or custom, and that each has suffered and will continue to suffer for an as yet undetermined length of time the following:

    a.   Mental pain and suffering;

    b.   Emotional distress; and

    c.   Loss of enjoyment of life.

### VI.    PRAYER FOR RELIEF

WHEREFORE, PLAINTIFFS DEMAND:

A.    Judgment awarding compensatory damages in favor of each of the individual Plaintiffs in an amount to be determined by the finder of fact in accordance with the proof, plus interest at the legal rate until paid;

B.    Declaratory judgment that the policies, practices, and acts complained of herein are illegal and unconstitutional;

C.      A permanent injunction, enjoining the defendants from engaging in the practice of threatening to seek an emergency custody order (ECO) when the threat of obtaining an order is itself unlawful and likely to coerce a parent into surrendering his or her rights without willful, voluntary, and informed consent, and under contamination from duress and coercion;

D.      Judgment mandating the expunging of all assessments, records, reports, documentation, photographs, data, and all other information collected and maintained by the Kentucky Department for Community Based Services, Division of Protection and Permanency, in connection with its illegal investigation, home entry, seizure, and strip search on March 31, 2017 and subsequent thereto;

E.      Judgment awarding plaintiffs' costs and attorneys' fees pursuant to 42 U.S.C. § 1988;

F.      Trial by jury on all issues for which a jury trial may be had.

G.      Any other relief to which the Plaintiffs may be entitled and for such orders as the Court deems necessary or appropriate; and

Respectfully submitted,

/s Vincent F. Heuser, Jr.

_____
Vincent F. Heuser Jr.
Hirsh and Heuser Attorneys
3600 Goldsmith Lane
Louisville, KY 40220
Phone: (502) 458-5879
E-mail: vheuser@hirshandheuser.com
*Counsel for Plaintiffs*