UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY

JOSIAH CURRY, et al.                                                    PLAINTIFFS

v.                                                      Case No. 3:17-CV-00730-JRW-CHL

KENTUCKY CABINET FOR HEALTH AND
FAMILY SERVICES, et al.                                                DEFENDANTS

## **ORDER**

o       The Court **GRANTS IN PART and DENIES IN PART** Furnish and Ward's joint motion for summary judgment (DN 64).

    a.      The Court **DISMISSES** the Currys' Fourteenth Amendment claims and their *Monell* claim with prejudice.

o       The Court **GRANTS IN PART and DENIES IN PART** Childress's motion for summary judgment (DN 65).

    a.      The Court **DISMISSES** the Currys' illegal seizure claim against Childress based on her interview of their daughter with prejudice.

o       The Court **DIRECTS** the Clerk of Court to seal DN 72-6 and **ORDERS** the Currys to file a redacted copy of the filing no later than September 4, 2020.

## **MEMORANDUM OPINION**

In March 2017, Jeanetta Childress, a social worker, and Michael Furnish, a police officer, arrived at Holly Curry's door and threatened to take away her kids if she did not consent to a warrantless entry into her family's home.  When Holly relented, Childress and Furnish entered. Childress strip searched all 6 children without any reason to suspect any physical or sexual abuse.

The Currys sued Childress and Furnish for violating the Fourth Amendment by entering their home without a warrant or consent and strip searching their children.  They also brought a Fourth Amendment illegal seizure claim against Childress for interviewing the oldest child, who was only 6 years old, and Fourteenth Amendment claims against Childress and Furnish for threatening to remove their children and interfering with their family integrity.  Last, the Currys sued Sheriff John Ward in his official capacity.  They say that the Hardin County Sheriff's Office has an unconstitutional policy or custom of assisting Child Protective Services with entering homes without a warrant or consent.[1]

Childress, Furnish, and Ward move for summary judgment on the Currys' claims.[2]  The Court grants those motions in part and denies them in part.  The Currys' Fourth Amendment claims against Childress and Furnish for the warrantless entry and strip searches survive.

---

[1] The Currys also sued the Kentucky Cabinet for Health and Family Services, Vicky Yates Brown Glisson in her official capacity as Secretary of the Kentucky Cabinet for Health and Family Services, and the Kentucky Department for Community Based Services, Division of Protection and Permanency.  DN 1.  The Court previously dismissed these claims.  DN 15.
[2] DN 64; DN 65.

# I.

The Court presents the facts in the Currys' favor.[3]

Holly Curry was driving her six kids under the age of seven to karate class.  On the way, she stopped at a café for some coffee and muffins.[4]  She parked and left the children asleep in the car while she went in to get the food.[5]  The outside temperature was in the low- to mid-60's.[6]

Someone observed Holly leave the children in the car and contacted the police.[7]  An officer approached Holly when she returned about five or ten minutes later.  Holly told the officer that she believed her kids were safe because the van's fan was on high, its key was out of the ignition, and its safety features would shut down the car if anyone tampered with the transmission.[8]  He told Holly that the kids should never be left unattended, and she told him she understood.[9]  He also told her that he had to file a report with the Kentucky Cabinet for Health and Family Services and that a social worker would be sent to the Currys' home to investigate the report.[10]  The officer allowed Holly to leave with her children and didn't bring any criminal charges against her.[11]

Childress received a copy of the report the next day.[12]  Although some emergency reports require social workers to follow up within as little as four or 24 hours, Childress had 48 hours to

---

[3] *Everly v. Everly*, 958 F.3d 442, 448 (6th Cir. 2020) (Bush, J.) ("At the summary judgment stage, the evidence is construed and all reasonable inferences are drawn in favor of the nonmoving party.") (cleaned up).
[4] DN 72-2 at #660.
[5] *Id.*
[6] *Id.* at #661-62.
[7] DN 72-3 at #672.
[8] DN 72-2 at #670; *id.* at #666 ("The keys were not in the ignition and there is a safety feature that in the event that the – that the transmission were tampered with, that the car would have stopped."); *id.* at # 667 ("The fan was on high.").
[9] DN 72-2 at #670.
[10] *See id.*
[11] DN 72-4 at #683.
[12] DN 72-6 at #702-3.

follow up on this report.[13] The same day, Childress went to the Currys' house, knocked on the door, and told Holly she needed to come inside to investigate the children.[14] Holly twice told Childress that she could not come in without a warrant.[15] Childress told her she would go get the police, and left.[16]

Childress met Furnish in the sheriff's office parking lot.[17] Childress told Furnish that she "was having a hard time getting" in the house, and she just "needed in there to" interview the kids and investigate.[18] She also told Furnish that the family's background was clean, and there was no history with CPS.[19]

Childress and Furnish drove back to the Currys' house. This time, Furnish knocked on the door.[20] He was armed and in uniform.[21] Again, Holly answered. Childress and Furnish told her they "needed to come in."[22] Again, Holly asked if they had a warrant.[23] And again — when Furnish replied that they did not — Holly refused to let them in.[24]

Childress started yelling at Holly.[25] Holly asked if they could reschedule the visit for when her husband was home.[26] She also offered to bring the children to the door so Childress could see

---

[13] *Id.* at #701-3.
[14] DN 72-7 at #710-11.
[15] *Id.*
[16] *Id.*
[17] DN 72-8 at #714.
[18] *Id*
[19] *Id.*
[20] DN 72-12 at #747.
[21] *Id.* at #748.
[22] DN 72-13 at #756.
[23] *Id.*
[24] *Id.*
[25] *Id.*
[26] DN 72-14 at #764-5, 767.

them.[27]  But Furnish and Childress would not agree to that.  Instead, they both told her that if she didn't let them in, they would get an emergency custody order.[28]  When Holly asked what this meant, Furnish told her, "We'll come back and take all of your children."[29]  Childress and Furnish both started yelling, "What's it gonna be?"[30]  Holly started crying.[31]  She said, "Fine, we can do this."[32]

Childress and Furnish entered the home.  Childress made "inappropriate" comments about the Currys' family size and religious beliefs.[33]

Childress interviewed the two oldest children in a bedroom, separately, while Furnish waited in the hallway.  Holly stayed with the rest of the children in another part of the house.  At one point, Holly tried calling her husband, but Childress sat on her phone.[34]

After the interviews, Childress told Holly that she needed to examine the children for signs of physical injury.[35]  Holly and many of the children were crying.[36]  Holly and Furnish were present when Childress conducted the searches.  Furnish talked to some of the children as Childress examined them.[37]  This examination included inspecting each child's genitals.

---

[27] *Id.* at #767.
[28] DN 72-13 at #757.
[29] DN 72-15 at #769.
[30] DN 72-13 at #758.
[31] *Id.*
[32] *Id.*
[33] DN 72-12 at #749.  Of course, state actors cannot target people for extra scrutiny based on their sincerely held religious beliefs.  *See Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 534 (1993); *see also* Ky. Rev. Stat. § 446.350.  However, here, the Currys didn't bring any religious liberty claims.  *See* DN 1.
[34] DN 72-26 at #816.
[35] DN 72-18 at #773.
[36] *Id.* at #781.
[37] DN 72-16 at #774; DN 72-17 at #777-8.

The initial report was marked "unsubstantiated."[38]   Nonetheless, Childress called both Holly and Josiah when she finished the investigation.[39]   Childress told Josiah, "If we ever get a call against your family again, bad things will happen to you and we'll take your children."[40] Then, she called Holly and again threatened to remove the children.[41]

## II.

We start with the Currys' illegal entry claim. Warrantless searches are presumed unreasonable.[42]   Even so, state actors can enter a home without a warrant under exigent circumstances[43] or with consent.[44]   Social workers are held to the same Fourth Amendment search and seizure standards as police officers.[45]

Here, because Childress and Furnish did not have a warrant, and because there weren't any exigent circumstances,[46] the key question is whether Holly voluntarily consented.[47]

Courts consider whether consent is voluntary by looking at the totality of the circumstances.[48]   There must be "some objectively improper action" by the state actors to show

---

[38] DN 72-19 at #788.

[39] *Id.* at #786.

[40] *Id.* at #786.

[41] *Id.* at #787.

[42] *Andrews v. Hickman County, Tennessee,* 700 F.3d 845, 854 (6th Cir. 2012) (quoting *Groh v. Ramirez*, 540 U.S. 551, 559 (2004)).

[43] *See Barton v. Martin*, 949 F.3d 938, 948 (6th Cir. 2020) ("Exigent circumstances exist when a reasonable officer could believe that there are real immediate and serious consequences that would certainly occur were a police officer to postpone action to get a warrant.") (cleaned up).

[44] *See* 700 F.3d at 854.

[45] *Id.* at 863.

[46] The Cabinet's report said the children were unharmed.  DN 72-6 at #703.  And the Currys had no history with child protective services.  DN 72-6 at #714.  And none of the defendants have argued that exigent circumstances existed.  *See* DNs 77 & 78.

[47] "[C]onsent to search must be 'voluntary, unequivocal, specific, intelligently given, and uncontaminated by duress or coercion.'" 700 F.3d at 854 (quoting *United States v. Canipe*, 569 F.3d 597, 602 (6th Cir. 2009)).

[48] *United States v. Ivy*, 165 F.3d 397, 402 (6th Cir. 1998).

coercion.[49]   As a general matter, it's not coercive for an officer to make a true, informative statement.[50]  But when state actors suggest that they will take hostile action against a member of someone's family, any consent that person gives after that threat is likely involuntary.[51]

Here, there was no legal basis for Childress's and Furnish's threat to get a custody order and "take all of [Holly's] children."  In Kentucky in 2017, a judge could only issue an ex parte emergency custody order when "removal [was] in the best interest of the child," *and* the parent was "unable or unwilling to protect the child," *and*:

  o      The child was "in danger of imminent death or serious physical injury or [was] being sexually abused;"

  o      The parent had "repeatedly inflicted or allowed to be inflicted by other than accidental means physical injury or emotional injury;" *or*

  o       The child was "in immediate danger due to the parent's failure or refusal to provide for the safety or needs of the child."[52]

Also, the Fourteenth Amendment places due process restrictions on ex parte custody orders in the absence of exigent circumstances.[53]

---

[49] *Id.* at 403 (cleaned up) (quoting *United States v. Crowder*, 62 F.3d 782, 787 (6th Cir. 1995)); *see also id.* ("a subjective belief of coercion is not enough to vitiate voluntariness").

[50] *See United States v. Salvo*, 133 F.3d 943, 954-55 (6th Cir. 1998) ("There is no evidence on the record that the agents' statements that they would secure a search warrant if [the suspect] did not consent were baseless or a pretext to coerce [the suspect], and, therefore, the statements do not render [the suspect's] consent involuntary.").

[51] *See* 165 F.3d at 404 ("hostile police action against a suspect's family is a factor which significantly undermines the voluntariness of any subsequent consent given by the suspect").

[52] Ky. Rev. Stat. §§ 620.060(1)(a) – (c) (2017) (amended 2018) (cleaned up).

[53] *See Kovacic v. Cuyahoga County Department of Children and Family Services*, 724 F.3d 687, 700 (6th Cir. 2013) ("in the context of child removal, due process requires, among other things, that parents be given notice prior to the removal of the child stating the reasons for the removal and that the parents be given a full opportunity at the hearing to present witnesses and evidence on their behalf.") (cleaned up) (quoting *Doe v. Staples*, 706 F.2d 985, 990 (6th Cir. 1983)). *See also id.* ("no reasonable social worker could conclude that the law permitted her to remove a child without notice or a pre-deprivation hearing where there was no emergency").

Here, Childress and Furnish had (a) no evidence that removing the Curry children from their parents was in their best interests; (b) no evidence the Currys were unable or unwilling to protect their children; (c) no evidence any of the children were facing death, serious injury, or sexual abuse; (d) no evidence the Currys had repeatedly inflicted physical or emotional harm on their children; and (e) no evidence the children were in immediate danger due to their parents' refusal to care for them.  In other words, not a single statutory prerequisite for an emergency custody order existed, much less the required combination.

Instead, Childress and Furnish knew only two things about the Currys, and both things cut *against* the grounds for a custody order.  First, they knew the Currys had no history with social services.  And second, they knew the Curry children had been utterly unharmed while waiting in their climate-controlled car for the time it took Holly to run in a coffee shop.  In that situation, no reasonable officer or social worker would think she could get an ex parte custody order.[54]

Under these facts, a jury could find that Holly's consent was coerced.  And clearly established law prohibited Childress and Furnish's conduct.  In 1998, the Sixth Circuit held that an officer's baseless threat to take a suspect's child "constituted an objectively improper police action."[55]  Thus, qualified immunity doesn't shield either Childress or Furnish for entering the Currys' home without a warrant.[56]

---

[54] Childress's claim that she thought she could get an ex parte custody order in this case is not relevant.  *See* DN 64-26 at #346.  Qualified immunity looks to "the objective reasonableness of an official's conduct."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).

[55] 165 F.3d at 403.

[56] Qualified immunity only shields government officials when "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." 457 U.S. at 818.

## III.

We turn to Childress and Furnish's actions once they entered the home.  The Currys say that Childress illegally seized their oldest daughter when Childress interviewed her alone.

A seizure occurs when "in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave."[57]  Social workers are held to the same standard as police officers when they illegally seize children during in-home interviews.[58]  But according to *Brent v. Wayne County Department of Human Services*, it is not clearly established that a seizure occurs when a social worker interviews a child alone in his bedroom without his parents' consent if the child (1) was never removed from his home, (2) wasn't told that he had to talk to the social worker, and (3) didn't ask the social worker not to interview him.[59]

As in *Brent*, the Currys do not allege that their daughter asked not to be interviewed, asked to end the interview, or resisted the interview.  But even if their situation is distinguishable from *Brent*'s, the Currys don't point to any case, [60]  and the Court isn't aware of any case, that would put Childress on notice that Childress seized the Currys' daughter when Childress interviewed her.

---

[57] *Brent v. Wayne County Department of Human Services*, 901 F.3d at 686-87 (6th Cir. 2018) (quoting *Myers v. Potter*, 422 F.3d 347, 356 (6th Cir. 2005)).

[58] *See Andrews*, 700 F.3d at 863 ("the Fourth Amendment standards are the same, whether the state actor is a law enforcement officer or a social worker"); *see also Barber v. Miller*, 809 F.3d 840, 845 (6th Cir. 2015) (an in-home interview "triggers all manner of heightened privacy concerns").

[59] 901 F.3d at 687 ("the social workers never removed [the child] from his home, rendering it far less likely that [the child] felt unable to leave their presence.") (cleaned up).

[60] *See* 700 F.3d at 853; *see also Barton v. Martin*, 949 F.3d 938, 947 (6th Cir. 2020) ("After a defending officer initially raises qualified immunity, the plaintiff bears the burden of showing that the officer is not entitled to qualified immunity.").

True, as was explained above, Childress and Furnished unconstitutionally entered the Currys' home without a warrant, and the Currys may recover any damages caused by the illegal entry. But qualified immunity shields Childress for the alleged illegal seizure because it was not clearly established that she seized the Currys' daughter during the illegal entry.[61]

## IV.

Then, Childress searched the bodies and inspected the genitals of each child for signs of physical abuse. Furnish was present during the searches and talked to some of the children while Childress searched them. The Currys claim these strip searches were illegal.

Strip searches of children implicate "the fundamental dignity of a young person's body."[62] Without consent, searches of children in their home require probable cause.[63] The "knowledge component of probable cause for a law enforcement officer's evidence search is that it raise a fair probability, or a substantial chance, of discovering evidence" of wrongdoing.[64] Searching a child for signs of abuse falls under this standard because it may lead to evidence of wrongdoing.[65]

Here, Childress lacked even a shadow of probable cause that the Currys physically abused their children. No one had ever reported physical abuse. There was no evidence of it. Nothing about their house indicated they lived in dangerous conditions. The children didn't tell Childress anything that pointed to "a substantial chance" of physical abuse. In fact, the two oldest children

---

[61] Because the law was not clearly established, we don't need to determine whether Childress unreasonably seized the oldest daughter. *See Safford Unified School District No. 1 v. Redding*, 557 U.S. 364, 379 (2009).

[62] *Hearring v. Sliwoski*, 712 F.3d 275, 280 (6th Cir. 2013). *See also New Jersey v. T.L.O.*, 469 U.S. 325, 337-38 (1985) ("A search of a child's person . . . no less than a similar search carried out on an adult, is undoubtedly a severe violation of subjective expectations of privacy.")

[63] 557 U.S. at 371.

[64] *Id.* (cleaned up).

[65] *See* 712 F.3d at 282 (an investigation into child abuse "could lead to law-enforcement action.").

told Childress that their parents didn't even use corporal punishment.[66]  In Childress's own words, Holly and her husband were "attentive and loving" parents.[67]

If Childress did what the Currys allege, strip searching the children was clearly unconstitutional.  Other Circuits have reached this conclusion in similar cases.[68]  Childress's alleged actions were "so clearly" unconstitutional under Supreme Court precedent that we don't need to find that "the very action[s] in question have previously been held unlawful" in this circuit.[69]  To hold otherwise would permit social workers to strip search children as a matter of course in every investigation.  Incredibly, Childress repeatedly testified that she believed she should "automatically" strip search *any* child who was four or under.[70]  The Constitution protects against that approach to children's privacy, and no reasonable social worker could think otherwise.

Thus, Childress.  What about Furnish?[71]  While he didn't physically remove the children's clothing to look for marks or bruises, he engaged with the children throughout the searches.  At

---

[66] *See* DN 64-14 at #325, #327.

[67] DN 78 at #866.

[68] *Calabretta v. Floyd*, 189 F.3d 808, 818 (9th Cir. 2009) (social worker lacked qualified immunity when she strip searched a child "when she had little reason to believe that the three year old was abused."); *see also Good v. Dauphin County Social Services*, 891 F.2d 1087, 1092 (3rd Cir. 1989) (No qualified immunity for a social worker and police officer who conducted a warrantless, non-consensual strip search of a child based on an anonymous tip of abuse because the "contours of the rights" of the plaintiffs "were sufficiently well established.") (cleaned up).

[69] *Redding*, 557 U.S. at 377 (cleaned up) (quoting *Wilson v. Layne*, 526 U.S. 603, 615 (1999)). Note that an "unlawful entry or search of a home does not end when the government officials walk across the threshold." 189 F.3d at 820.  It is also illegal for state actors to "impose their will on the residents of the home in which they have no right to be." *Id.*

[70] DN 65-25 at #452, #454.

[71] *See Schulkers v. Kammer*, 955 F.3d 520, 533 (6thCir. 2020) ("When determining whether defendants are entitled to qualified immunity, we do not lump together each of the relevant government actors.  Rather, we assess each actor's liability on an individual basis.") (cleaned up).

one point, he encouraged one of the children to remove his shirt.[72]  It's unclear why Furnish was present during the strip searches if not to facilitate them.

Had Furnish only witnessed the strip searches — rather than talk to the children during the search and encourage them to undress — he might be entitled to qualified immunity.  The law is less clear about an officer's liability when he is simply present while a social worker unreasonably strip searches a minor.[73]  But here, a jury could find that Furnish participated in the unconstitutional strip searches of the children.  And as already stated, the law against those searches under these facts is so well-established that a reasonable officer would know that the searches here were unconstitutional.

Qualified immunity doesn't shield Childress and Furnish for strip searching the Currys' children.

## V.

The Currys also brought claims against Childress and Furnish under the Fourteenth Amendment for threatening to remove their children and for interfering with their family integrity.  But these claims rely on the same facts alleged in the Currys' Fourth Amendment claims.  "Where a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing these claims."[74]

Dismissal of the Currys' Fourteenth Amendment claims is appropriate.

---

[72] DN 72-16 at #774.

[73] *But cf. Fazica v. Jordan*, 926 F.3d 283, 292 (6th Cir. 2019) ("specific constitutional violations can be committed not only by an officer personally applying excessive force, but also by an officer witnessing excessive force and neglecting his duty to intervene.").

[74] *Johnson v. City of Cincinnati*, 310 F.3d 484, 490-91 (6th Cir. 2002) (cleaned up).

## VI.

Last, the Currys allege that the Hardin County Sheriff's Office has an unconstitutional policy or practice of helping social workers coerce consent for warrantless entries into homes in child abuse or neglect investigations.[75]

The Currys have not produced any evidence that the sheriff's office has such a policy, practice, or custom.[76]   True, they've shown that the sheriff's office frequently assists in child neglect or abuse cases.   They've even shown that it's "standard . . . operating procedure" to involve the police when a social worker is refused entry.[77]   But all of this falls short of showing a policy or custom of unconstitutional action.   Police presence or assistance, without more, is not inherently coercive or unconstitutional.   This is true even if the officer's goal is to gain entry into the home, as long as objectively improper actions aren't used to get consent.[78]   Here, there is no evidence of a custom or policy of objectively improper police action.   No reasonable jury could conclude such an illegal practice exists here, and summary judgment on this claim is proper.

---

[75] "This court engages in a two-pronged inquiry when considering a municipal-liability claim. First, the court must determine whether the plaintiffs have asserted the deprivation of a constitutional right.  If so, the court must then decide whether the City and County are responsible for that deprivation."   *Cash v. Hamilton County Department of Adult Probation*, 388 F.3d 539, 542 (6th Cir. 2004) (cleaned up); *see also Monell v. Department of Social Services of New York*, 436 U.S. 658, 694 (1978) ("[I]t is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983.").

[76] DN 72-22 at #800; DN 64-19 at #336; DN 64-26 at #346.

[77] DN 72-9 at #723.

[78] *See United States v. Crowder,* 62 F.3d 782, 787 (6th Cir. 1995);  *see also United States v. Salvo*, 133 F.3d 943, 954-55 (6th Cir. 1998) (an officer's truthful statements that he would get a search warrant if the defendant didn't consent to a search was not coercive).

* * *

Act One: An "attentive and loving" mother gets muffins for her children.  Act Two: There's a knock on her door and a threat by the government to take away her children.  Act Three: Her children are strip searched without cause.

America's founding generation may never have imagined a Cabinet for Health and Family Services.  But they knew their fair share of unwelcome constables.  And they added a Fourth Amendment to our Constitution to protect against this three-act tragedy.

Justin R Walker, District Judge
United States District Court

8/18/2020